NAARTEX CONSULTING CORPORATION, Appellant, Russell Huff,

v.

James G. WATT, Secretary of Interior, et al.

No. 82–1979.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1983.

Decided Nov. 29, 1983.

---

Daniel J. Piliero, II, Washington, D.C., with whom Kathryn L. Mann, Washington, D.C. was on the brief, for appellant.

C. Michael Buxton, Washington, D.C., with whom Charles D. Tetrault, Washington, D.C., and B. Lee Ware, Jr., Houston, Tex., for American Natural Resources Co., et al., Gerry Levenberg, Washington, D.C., and Laura L. Payne, Denver, Colo., for General American Oil Co. of Texas, Thomas P. Humphrey, Washington, D.C., for James S.

Harrell, and C. Scott Crabtree, Denver, Colo., for Gordon L. Heele, et al., were on the joint brief, for appellees.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with whom Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., was on the brief, for appellee, James G. Watt, Secretary of the Interior.

Thomas W. Ehrmann, Wayne E. Babler, Jr. and Charles A. Grube, Milwaukee, Wis., were on the brief, for appellee, Fred L. Engle d/b/a Resource Service Company.

Jerome C. Muys and John F. Shepherd, Washington, D.C., for Davis Oil Company and Paul Messinger & Co. Raymond Shibley, Brian D. O'Neill and Daniel J. Conway, Washington, D.C., for Panhandle Western Gas Co., Raymond G. Larroca, Thomas Carr, Washington, D.C., and William C. Anderson, Tulsa, Okl., for Reading & Bates Petroleum Co., were on the joint brief, for appellees. Erik B. Carlson, Denver, Colo., also entered an appearance for appellee, Davis Oil Company.

Richard G. Morgan, Martha Priddy Patterson, and Charles W. Garrison, Washington, D.C., were on the brief, for appellee, Raymond G. Albrecht.

Before WALD and BORK, Circuit Judges, and DAVID W. WILLIAMS *, Senior District Judge for the Central District of California.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This action begins with a lottery, held in Wyoming in 1975 by the Department of Interior to select a lessee for a parcel of land in Wyoming that was, at the time, outside any known producing oil or gas field. Two years later, the land began producing oil; and two years later still, Naartex Consulting Corporation (Naartex), acting on behalf of an unsuccessful applicant in the lottery, challenged the issuance of the lease. Naartex claimed that Resource Service Company (RSC), the filing service that had entered the winning application on

---

behalf of Norbert Albrecht, had retained an interest in many applications in the lottery, including Albrecht's, in violation of the legal limit of one application per person,[1] and that Albrecht and RSC had intentionally concealed this fact. Naartex also alleged that subsequent purchasers of interests in the lease had secretly conspired with Albrecht to pre-arrange their acquisitions before the lease was issued, also in violation of the regulations.[2] After pursuing administrative remedies, Naartex filed this action in the district court, primarily seeking damages from the private defendants, and mandamus relief against the government to order the cancellation of the lease.

The district court dismissed the complaint on numerous procedural grounds, set forth *infra* at 784–785. For the reasons explained below, we affirm.

## I. BACKGROUND

In March 1975, the Wyoming State Office of the Bureau of Land Management (BLM) held a "simultaneous oil and gas leasing" lottery pursuant to 43 C.F.R. §§ 3112 *et seq.* (1982) for the rights to lease a parcel of Wyoming land not "within any known geological structure of a producing oil or gas field." Mineral Lands Leasing Act of 1920, § 17(b), 30 U.S.C. § 226(b).[3] Norbert F. Albrecht won the lottery, and on June 1, 1975 the BLM issued to him lease number

W–50394. One month later, Albrecht assigned his entire title to the lease to J.S. Harrell, while retaining a five percent royalty interest in the lease. Numerous subsequent assignments of drilling rights, reservations and transfers of royalty interests followed. In 1977, a producing well began operations on the leased land.

On January 25, 1979, Alvin Abrams, as president of Geosearch, Inc., filed with the BLM a protest challenging the issuance of the lease to Albrecht. The Geosearch protest—filed in the name of all unsuccessful applicants in the lottery for lease W–50394—claimed that Albrecht's initial application violated the Department of Interior (DOI) regulations mandating disclosure in all lease applications of "the names of all other parties who own or hold any interest in the application, offer or lease, if issued." 43 C.F.R. § 3102.2–3. Geosearch protested that Albrecht had an undisclosed service agreement with Fred Engle, d/b/a Resource Service Company (RSC) when he filed his lease application, and that his service agreement constituted an "interest in the lease" that must be disclosed.[4] The BLM dismissed this protest on February 6, 1979 on various grounds, and on May 6 the Interior Board of Land Appeals (IBLA) dismissed Geosearch's appeal because a statement of reasons for the appeal had not been filed.[5]

---

1. Under 43 C.F.R. § 3112.2–1(f) (1982), "[n]o person or entity shall hold, own or control any interest in more than one application for a particular parcel."

2. *See* 43 C.F.R. § 3112.4–3 (1982) ("No application, offer, lease or interest therein may be transferred or assigned prior to the issuance of the lease ....").

3. For a detailed description of the simultaneous oil and gas leasing program, see *Lowey v. Watt*, 684 F.2d 957, 960–61 (D.C.Cir.1982).

4. Under Albrecht's service agreement, RSC gained exclusive brokerage rights to sell any lease that Albrecht might win. Whether RSC acted as broker or Albrecht negotiated a sale himself, RSC would receive 16% of the first $100,000 and 12% thereafter of any selling price or royalty payments for five years. *See* RSC Service Agreement with Norbert Albrecht, *reprinted in* Statement of Reasons on Behalf of

Resource Services Company, Inc. app. C., Matter of Raymond Albrecht, IBLA No. 80–867 (Oct. 6, 1980). The Interior Board of Land Appeals, two years after the lottery for lease W–50394, held that such service agreements create "interests" in lease applications, and that filing services entering multiple applications pursuant to such agreements consequently violate the prohibition against holding interests in more than one application for a given lease. *See* Sidney H. Schreter, 32 IBLA 148 (1977); Lola I. Doe, 31 IBLA 394 (1977). In these decisions, the Interior Department refused to issue leases to RSC clients. After the *Doe* and *Schreter* decision, RSC altered its agreements to conform with BLM policy. *See Lowey v. Watt*, 684 F.2d at 963.

5. *See* Letter from Glenna M. Lane, Chief, Oil and Gas Section of Wyoming BLM to Alvin Abrams, President of Geosearch, Inc. (February 6, 1979), *reprinted in* Joint Appendix of Appel-

Four months later, on September 19, 1979, Abrams filed another protest against the issuance of lease W–50394, this time as the president of Naartex.[6] Naartex based its protest upon rights assigned to it by Russell Huff, an unsuccessful applicant in the 1975 lottery. On September 28, 1979, BLM dismissed the protest on the grounds that (1) Huff retained no interest in the lease because he failed to challenge its issuance within 30 days, (2) subsequent title transfers of the lease rendered its new holders "bona fide purchasers" whose interests may not be cancelled even though the initial lease holder may have violated the Mineral Lands Leasing Act,[7] and (3) sections 27(h)(1) and 31(a) of the Mineral Lands Leasing Act, 30 U.S.C. §§ 184(h)(1), 188(a), preclude the cancellation of a "producing lease" such as W–50394.[8] The IBLA dismissed Naartex's subsequent appeal on June 9, 1980 for the same reasons, noting also that Naartex "ha[d] not shown that the service agreement alleged to exist between [RSC] and Albrecht" constituted an "interest" that should have been disclosed pursuant to the regulations.[9]

On September 8, 1980, Naartex petitioned the IBLA for reconsideration of its decision. The IBLA denied the petition on September 18 because the petition was not "filed promptly" in accordance with Department regulations.[10] Next, on December 12, Naartex petitioned the Secretary of Interior to review the appeal; on April 6, 1981, Undersecretary Hodel denied the petition, finding the IBLA decision "to be a persuasive and conclusive disposition of the issues in this case." [11]

Naartex filed a complaint in the district court on July 6, 1981, claiming that the administrative failure to cancel lease W–50394 was arbitrary and capricious and a deprivation of property without due process of law. The complaint also sought damages from various private defendants for "intentionally deceiv[ing] the Department and all other offerors for parcel W–484 [*i.e.,* lease W–50394]," and for violating DOI disclosure regulations.[12] The district court summarily dismissed the action on the grounds that: (1) the court lacked personal jurisdiction over the private defendants, (2) venue did not lie in the District of Columbia, (3) the private defendants were indispensable par-

---

lees (J.A.A.) at 13–14; Order (May 6, 1979), *reprinted in* J.A.A. at 15.

**6.** Naartex and Geosearch share the same address, and Alvin Abrams is president of both companies. Both Naartex and Geosearch are in the business of protesting the issuance of public land leases on behalf of unsuccessful lease applicants. *See Naartex Consulting Corp. v. Watt,* 542 F.Supp. 1196, 1198 (D.D.C. 1982); *Geosearch, Inc. v. Andrus,* 508 F.Supp. 839, 841 (D.Wyo.1981).

**7.** *See* 43 C.F.R. § 3108.3(c) (1982) ("A lease or interest therein shall not be cancelled to the extent that such action adversely affects the title or interest of a bona fide purchaser even though such lease or interest, when held by a predecessor in title, may have been subject to cancellation.").

**8.** *See* Letter from Glenna M. Lane, Chief, Oil and Gas Section of Wyoming BLM to Naartex (Sept. 28, 1979), *reprinted in* Naartex Appendix (N.A.) at 29–30.

**9.** *See* 48 IBLA 166 (1980). The IBLA explained that RSC works with at least two different types of service agreements, only one of which constitutes an "interest" in the lease applica-

tion, *compare* Sidney H. Schreter, 32 IBLA 148 (1977) (RSC service agreement that constitutes an interest) *with* Geosearch, Inc., 39 IBLA 49 (1979) (RSC service agreement that does not constitute an interest), and that Naartex had failed to show which type of agreement Albrecht had signed. *See* 48 IBLA at 173. While Naartex, in administrative proceedings and in this action, submitted an RSC service agreement that it asserted to be Albrecht's, the name of the applicant on these exhibits is unintelligible because the signatures are not reproduced clearly. *See, e.g.,* Complaint ¶ 24 and Exhibit A, *reprinted in* N.A. at 5, 25. However, RSC introduced the Albrecht service agreement in another IBLA docket, revealing it to be the type of agreement that, under IBLA precedents, constitutes an interest in Albrecht's lease application. *See supra* note 4.

**10.** 43 C.F.R. § 4.126 (1982) provides that motions for reconsideration "shall be filed within 30 days from the date of receipt of a copy of the Board's decision."

**11.** *See* N.A. at 42.

**12.** Amended Complaint ¶ 77, *reprinted in* N.A. at 15.

ties to the action, (4) the Mineral Lands Leasing Act creates no private right of action, (5) the Anti-Assignment laws, 31 U.S.C. § 203. and 41 U.S.C. § 15, bar Naartex from asserting Huff's claims against the government, (6) Huff himself should not be permitted to join or intervene in this action because he failed to challenge the lease issuance in a timely manner, and because intervention should not be employed to cure an otherwise futile action, and (7) Naartex and Huff both lacked standing to challenge the lease issuance. *See Naartex Consulting Corp. v. Watt,* 542 F.Supp. 1196 (D.D.C.1982).

We affirm. The district court lacked personal jurisdiction over the private defendants, who are indispensable parties to this action. Venue also does not lie in this district. In addition, the district court was not obliged to transfer this action to another district where personal jurisdiction and venue could be had, because Naartex's claims suffer from serious substantive defects. Thus the district court properly dismissed the claims against the private defendants. As to the claims against the government, the district court also correctly chose to dismiss. Naartex runs afoul of federal anti-assignment statutes when it attempts to assert claims against the government on the basis of an assignment by Russell Huff, an unsuccessful lease applicant. Moreover, joinder of Huff to avoid the anti-assignment prohibition would have been futile. The Mineral Lands Leasing Act and regulations thereunder preclude cancellation of a producing lease—such as W–50394—except by judicial proceedings instituted by the Attorney General in the district where the leased land is located. Finally, because the private defendants are indispensable parties to the action to cancel the lease, the action may not proceed in their absence.

## II. THE CLAIMS AGAINST THE PRIVATE DEFENDANTS

Counts IV through VII of Naartex's amended complaint seek declaratory and injunctive relief and money damages from a variety of private defendants. These defendants include Raymond Albrecht, the brother and successor in interest of Norbert Albrecht, the winner of the 1975 lottery; RSC, the filing service that allegedly entered the Albrecht lease application without disclosing its own interest in that application; and numerous companies and individuals that gained interests in lease W–50394 after its issuance.

We believe the district court acted properly when it dismissed these counts. The district court lacked personal jurisdiction over these defendants. Moreover, proper venue for these claims does not lie in the District of Columbia. Finally, the district court had good reason to dismiss this case, rather than transfer it to another district.

*Personal Jurisdiction*

The district court correctly held that it lacked personal jurisdiction over the numerous private defendants. None of the defendants resides or is incorporated in the District of Columbia. To establish personal jurisdiction, then, Naartex must show that the defendants had the requisite "contacts" with the District. The District of Columbia "long-arm" statute, D.C.Code Ann. § 13–423, enumerates the possible bases for personal jurisdiction over nonresidents. Section 423(a)(1) extends personal jurisdiction to persons "transacting any business in the District of Columbia"; section 423(a)(4) extends to any person "causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue ... in the District of Columbia." These provisions are limited by section 423(b), which states that "only a claim for relief arising from the acts enumerated in this section may be asserted against him." Thus "section 423(b) ... bar[s] ... claims unrelated to the acts forming the basis for personal jurisdiction." *Willis v. Willis,* 655 F.2d 1333, 1336 (D.C.Cir.1981).

While Naartex in its pleadings in the district court contended that the defendants' acts in securing and transferring the

lease "were intended to have an impact in this District," [13] we cannot reasonably conclude, and Naartex does not here contend, that any "tortious injury" in the District forms the basis for this action. Personal jurisdiction may be exercised over the private defendants, therefore, only if they "transact[ed] business" in the District in connection with the operative facts of this action.

Naartex puts forward three possible "contacts" that they say establish the basis for personal jurisdiction over the defendants. First, they point to an office located in the District, operated by defendant American National Resources Company, where defendant Michigan Wisconsin Pipeline Company lists its name on the door and maintains a D.C. telephone listing. *See* Naartex Brief at 20–21. Yet Naartex has failed to allege any activities emanating from this office that gave rise to its claims in this case. Furthermore, according to the uncontradicted affidavit of Daniel F. Collins, the office "monitor[s] legislative and regulatory matters" and "maintain[s] official contacts with the Congress and the executive branch." Joint Appendix of Appellees (J.A.A.) at 31.

Until recently, we thought—as the district court here ruled—that under the law of the District of Columbia, personal jurisdiction could not be founded upon any kind of "government contacts," *i.e.,* "getting information from or giving information to the government, or getting the government's permission to do something." *Investment Co. Institute v. United States,* 550 F.Supp. 1213, 1216–17 (D.D.C.1982); *see Naartex Consulting Corp.,* 542 F.Supp. at 1199; *see also Fandel v. Arabian American Oil Co.,* 345 F.2d 87, 89 (D.C.Cir.1965); *Ramamurti v. Rolls-Royce, Ltd.,* 454 F.Supp. 407, 410–11 (D.D.C.1978), *aff'd mem.,* 612 F.2d 587 (D.C.Cir.1980). Indeed, in 1978, the District of Columbia Court of Appeals, sitting *en banc,* said:

to permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.

*Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808, 813 (D.C.1976). That holding would certainly preclude personal jurisdiction over American Natural Resources and Michigan Wisconsin Pipeline in this case. Two years later, however, a panel of the same court appeared to limit the "government contacts" exception to activities implicating first amendment rights. *See Rose v. Silver,* 394 A.2d 1368, 1373–74 (D.C.1978). In denying rehearing *en banc* in the *Rose* case, the full court failed to explain or reconcile the apparent conflict with the *Environmental Research* opinion, one judge finding none, and two other judges calling for the explicit rejection of the panel opinion in *Rose. See Rose v. Silver,* 398 A.2d 787 (D.C.1979). Since that time, the court has failed to clarify any possible conflict. Inasmuch as the denial of rehearing is evidence that no irreconcilable tension exists between the *en banc* opinion and a subsequent panel opinion, and considering that a panel of the District of Columbia Court of Appeals "is prohibited from issuing an opinion which conflicts materially with a prior decision of [the full] court as this may be done only by the court sitting *en banc,*" *Rose v. Silver,* 398 A.2d 787, 787 (D.C.1979) (denying petition for rehearing) (citing *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971)), if it were necessary to determine what law controls today in the District of Columbia, we would still be hesitant to conclude that the clear holding against governmental contacts as a basis for personal jurisdiction in *Environmental Research* no longer controls. *See Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 204–05, 76 S.Ct. 273, 276–

---

**13.** Opposition of Plaintiff Naartex to Defendants' Motion to Dismiss the Amended Complaint at 39.

77, 100 L.Ed. 199 (1956); *id.* at 209–12, 76 S.Ct. at 279–81 (Frankfurter, J., concurring).

Fortunately, if there is any tension between *Environmental Research* and *Rose,* we need not resolve it, because in this case all relevant activities upon which Naartex seeks to base its claim—contacts upon which they must also rely to establish long-arm jurisdiction under the section 423(a)(1) "transacting business" provision, *see, e.g., Berwyn Fuel, Inc. v. Hogan,* 399 A.2d 79, 80 (D.C.1979) (per curiam); *Bueno v. La Compania Peruana de Radiodifusion, S.A.,* 375 A.2d 6, 9 (D.C.1977); D.C.Code § 13–423(b) —implicate the first amendment guarantee "to petition the Government for redress of grievances" and so would qualify for exemption under the *Rose* test as well. U.S. Const. amend. I. Naartex contends that American Natural Resources and Michigan Wisconsin "made personal appearances before the Interior Department" as a part of their allegedly fraudulent scheme, and that this activity forms the basis for personal jurisdiction. Naartex Brief at 21. These appearances, made in an attempt to influence government action as to lease W–50394, undoubtedly qualify as exercises in petitioning the government. *See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972) ("Certainly the right to petition extends to all departments of Government."); *Doe v. McMillan,* 566 F.2d 713, 718 (D.C.Cir.1977) ("This right is not limited to petitioning Congress but extends to administrative agencies and to the courts."), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978).

Further, Naartex claims that American Natural Resources and Michigan Wisconsin made their administrative appearances "not in order to engage in privileged lobbying activities, but simply to protect the[ir] lease." Naartex Brief at 21. However, the companies' defense of their rights before a governmental body is no less a "petition" simply because they sought to protect their *proprietary* interests from an adverse regulatory decision, or because Naartex in this action seeks to strip them of those very interests. A different case might be presented had Naartex made credible and specific allegations in the district court that the companies had used the proceedings as an instrumentality of the alleged fraud. The hour has passed for Naartex to raise such allegations now.[14]

Finally, Naartex claims that RSC has submitted to service of process in the District by registering "to do business" here. Naartex Brief at 21. As we noted above, however, Naartex must also show that RSC's contacts with the District form at least part of the basis for its claims. Naartex has failed to do so here.

■ We also note that Naartex lists *thirteen* private defendants in its complaint— all nonresidents of the District—but alleges no "contacts" with the District concerning *ten* of them, beyond the bald speculation that these ten were "alleged co-conspirators." *Id.* at 22. Such a conclusionary statement does not constitute the *prima facie* showing necessary to carry the burden of establishing personal jurisdiction. *See, e.g., McLaughlin v. McPhail,* 707 F.2d 800, 806 (4th Cir.1983) ("bare allegation" of

14. In the district court, Naartex argued: "[i]f, as the plaintiff contends, the defendants joined a conspiracy to defraud the public and the Department, those acts were intended to have significant impact in this District, without question. Thus all defendants are properly before the court in this case." Opposition of Plaintiff Naartex to Defendants' Motion to Dismiss the Amended Complaint at 39. In its amended complaint, Naartex alleged that "RSC implemented [its] multiple filing scheme pursuant to a conspiracy with defendants Harrell, Michigan Wisconsin, American and General." Amended Complaint ¶ 36, *reprinted in* N.A. at

7. Both statements, and numerous others made in the district court, intimate that the conspiracy Naartex sought to redress occurred outside the district—most likely in Wyoming, where the lottery and the alleged multiple filings took place. Naartex now appears to alter its view of the facts in order to obtain personal jurisdiction over the defendants. *See* Naartex Brief at 15 ("in the District of Columbia, where the fraud clearly occurred"); *id.* at 25 ("the most substantial part of the private defendants fraudulent acts occurred here [in the District of Columbia]").

"fraudulent conspiracy" insufficient); *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 n. 5 (9th Cir.1980) ("a plaintiff must allege specific acts connecting defendant with the forum"); *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir.1975) ("the bland assertion of conspiracy or agency is insufficient to establish [personal] jurisdiction").

▪ Naartex next asserts that the district court committed reversible error by denying permission to conduct additional discovery for the purpose of establishing personal jurisdiction. Discovery under the Federal Rules of Civil Procedure is, of course, broad in scope and freely permitted. *See* Fed.R.Civ.P. 26(b)(1) advisory committee note. At the same time, however, "[a] district court has broad discretion in its resolution of discovery problems that arise in cases pending before it." *In re Multi-Piece Rim Products Liability Litigation*, 653 F.2d 671, 679 (D.C.Cir.1981). The district court did not abuse its discretion when, as here, Naartex had "ample opportunity" to take discovery,[15] *Zerilli v. Smith*, 656 F.2d 705, 716 (D.C.Cir.1981), and the pleadings contained no allegations of specific facts that could establish the requisite contacts with the District, *see McLaughlin v. McPhail*, 707 F.2d at 807 ("Finding no *prima facie* showing of conspiracy .... the district court properly exercised its discretion in denying the discovery"); *Lehigh Valley Industries*, 527 F.2d at 93–95 ("no abuse of discretion in the denial of discovery" in face of "the bland assertion of conspiracy"). We accordingly uphold the district court's determination that the pri-

vate defendants were not subject to personal jurisdiction in the district, and its denial of further discovery.[16]

▪ We also approve the district court's finding that these defendants are "indispensable parties" within the ambit of Fed.R.Civ.P. 19(b). Numerous cases hold that "an action seeking rescission of a contract must be dismissed unless all parties to the· contract, and others having a substantial interest in it, can be joined." *Acton Co. v. Bachman Foods, Inc.*, 668 F.2d 76, 81–82 (1st Cir.1982); *see Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701 (2d Cir.1980); *Chiodo v. General Waterworks Corp.*, 380 F.2d 860, 866–67 (10th Cir.), *cert. denied*, 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967). More specifically, parties who hold royalty interests, assignments, or interests in the title of federal leases, in the absence of special circumstances not present here, are indispensable parties in an action to cancel the lease or to try title to the lease. *See, e.g., Doty v. St. Mary Parish Land Co.*, 598 F.2d 885, 887–88 (5th Cir.1979); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325–26 (9th Cir.1975), *cert. denied sub nom. Susenkewa v. Kleppe*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). All private defendants in this action hold proprietary interests in lease W–50394, which Naartex seeks to cancel. Thus these defendants are indispensable parties, and the district court properly refused to proceed with the action in their absence, considering the availability of an alterna-

---

**15.** In its brief, Naartex argues that it had no adequate opportunity for discovery because it "served its discovery requests within a month of the filing of the last motion to dismiss." Naartex Brief at 28 n. 13. The time of the *last motion to dismiss is irrelevant to the question* whether Naartex was afforded sufficient opportunity for discovery. Naartex was put on notice that personal jurisdiction would be challenged over six months before the dismissal of this case. *See* Memorandum in Support of Defendants' Joint Motion for Extension of Time, and Suggestion to the Court at 1 (filed Sept. 2, 1981) ("The undersigned defense counsel, having reviewed the complaint, believe that

several initial dispositive defenses exist with regard to the allegations of the complaint. These defenses include ... lack of personal jurisdiction ....").

**16.** Naartex also contends that further discovery was essential to establish whether an implied right of action exists under the Mineral Leasing Act. *See* Naartex Brief at 25–27. Because the question whether to imply a private statutory right of action primarily concerns legislative intent—and not the particular facts of any given case—this contention lacks any merit.

tive forum in Wyoming where personal jurisdiction might be achieved. *See* Fed.R. Civ.P. 19(b).

*Venue and Transfer*

Naartex contends that even if the district court lacks personal jurisdiction over the private defendants, the dismissal of the action constitutes an abuse of discretion. Instead, Naartex argues, the district court should have transferred the case to Wyoming, where personal jurisdiction and venue would lie.

██ We note, to begin with, that venue for this action does not lie in the District of Columbia. When, as here, subject matter jurisdiction "is not founded solely on diversity of citizenship," venue lies only in "the judicial district where all defendants reside, or in which the claim arose . . . ." 28 U.S.C. § 1391(b). Because no defendants in this action, except perhaps the Secretary of Interior, reside in the District of Columbia, and because Naartex's claim did not arise in the District of Columbia,[17] venue does not lie here.

Naartex nevertheless asserts that the district court was obliged to transfer this case pursuant to 28 U.S.C. § 1406(a), which provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

██ A court may transfer a case to another district even though it lacks personal jurisdiction over the defendants. *See, e.g., Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 915, 8 L.Ed.2d 39 (1962). The decision whether a transfer or a dis-

missal is in the interest of justice, however, rests within the sound discretion of the district court. *See, e.g., Cook v. Fox,* 537 F.2d 370, 371 (9th Cir.1976); *Hayes v. RCA Service Co.,* 546 F.Supp. 661, 665 (D.D.C. 1982). *See generally* 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3827, at 170 (1976). We find that the district court did not abuse its discretion by dismissing this action, because, as explained below, Naartex failed to show that its claims—both the implied statutory right of action and the common law fraud claims—could properly be heard in any federal court. In light of the substantive problems with its asserted claims, Naartex's additional objection that the case should have been transferred to another federal court is likewise without merit.

██ First, the Mineral Lands Leasing Act of 1920 does not create an implied right of action against the private defendants. As noted many times, when determining whether an implied right of action exists under a federal statute, legislative intent is the dispositive factor. *See, e.g., Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union,* 457 U.S. 15, 22, 102 S.Ct. 2202, 2206, 72 L.Ed.2d 639 (1982); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979).

In enacting the Mineral Lands Leasing Act, Congress did not express any intention to create a statutory private right of action to enforce compliance with the disclosure requirements found in the DOI lease lottery regulations. Congress' central purpose in enacting the Mineral Leasing Act was the establishment of an orderly system by

17. Of the many events underlying this action, the district court found only one—the rejection by Undersecretary Hodel of Naartex's petition to review the IBLA decision—that occurred in the District of Columbia. *See Naartex,* 542 F.Supp. at 1201. On the other hand, the great weight of significant events relating to this action occurred in Wyoming: the land is located there, and the lottery and lease issuance took place there. Furthermore, none of the private parties to this action reside in the District of Columbia. Thus, whether one uses the "significant contacts" test, *see Lamont v. Haig,* 590 F.2d 1124 (D.C.Cir.1978), or the "place of injury" test, *see Rosenfeld v. S.F.C. Corp.,* 702 F.2d 282, 284 (1st Cir.1983) (quoting *Grappone, Inc. v. Subaru of Am., Inc.,* 403 F.Supp. 123, 133 (D.N.H.1975)), the claim in this case undoubtedly arose in Wyoming. *See Leroy v. Great Western United Corp.,* 443 U.S. 173, 185–86, 99 S.Ct. 2710, 2717–18, 61 L.Ed.2d 464 (1979).

which the federal government could control the leasing of public land:

> Prior to 1920, oil and gas rights in public lands were acquired in the same way as rights in other minerals—by a form of "location." One staked out a location and prospected for oil or other minerals; upon making a discovery, he became entitled to a patent to the land as well as the minerals.
>
> . . . .
>
> The Mineral Leasing Act of 1920 changed the procedure for acquiring oil and gas rights in public lands: The Secretary was empowered to issue prospecting permits and required, in the event a discovery was made under the permit, to issue a lease . . . .

*Udall v. Tallman,* 380 U.S. 1, 21–22, 85 S.Ct. 792, 803–804, 13 L.Ed.2d 616 (1965); [18] see also *California Co. v. Udall,* 296 F.2d 384, 388 (D.C.Cir.1961) ("The Act was intended to provide wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public."). Accordingly, the statutory scheme confers upon the Secretary of Interior authority to administer the leasing program as "the statutory guardian of this public interest." *Id.* (footnote omitted). The Secretary, and not the citizenry at large, was intended to oversee the proper allocation and development of the public lands.

 Furthermore, section 27 of the Act expressly authorizes cancellation of a lease, acquired in violation of the Act, only through an "appropriate proceeding instituted by the Attorney General." 30 U.S.C. § 184(h)(1). Considering the "elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it," *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979), we hold that no implied cause of action of the sort Naartex asserts exists under the Mineral Leasing Act.[19] *See National Railroad Passenger Corp. (Amtrak) v. National Association of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) ("when legislation expressly provides a particular remedy or

---

**18.** In 1935, Congress eliminated the prospecting permit system and instituted the present direct leasing system. Act of August 21, 1935, 49 Stat. 676, 677, 30 U.S.C. §§ 223, 226.

**19.** Naartex asserts that, in the absence of an implied right of action, there will be "no real deterrent" to fraudulent lease applications. We disagree. First, 18 U.S.C. § 1001 makes it a crime punishable by up to five years imprisonment and $10,000 fine "knowingly and willfully [to] conceal[ ] or cover[ ] up by any trick, scheme or device a material fact, or [to] make[ ] any false, fictitious or fraudulent statements or representations" in "any matter within the jurisdiction of any department or agency of the United States." Mindful of this prohibition, the BLM has directed its officers to refer fraudulent lease applications for "investigations for prosecutions under 18 U.S.C. § 1001." 43 C.F.R. § 3112.6–1(e) (1982). Also, fraudulent applications will often violate the mail and wire fraud statutes. *See* 18 U.S.C. §§ 1341, 1343.

Finally, the BLM system of protests and cancellation offers a substantial deterrent. The 30-day time limitation for protests is tolled so long as the fraud is concealed. When a party "has been injured by fraud and 'remains in ignorance of it without any fault or want of

diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered . . . .' " *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (quoting *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874)). And it is well established that "[t]his equitable doctrine is read into every federal statute of limitations." *Id.; see Fitzgerald v. Seamans,* 553 F.2d 220, 228 (D.C.Cir.1977); *ILGWU v. NLRB,* 463 F.2d 907, 922 (D.C.Cir.1972).

In this case, however, neither Naartex nor Huff filed a protest within 30 days after a reasonably diligent person would have discovered the suspected fraud related to lease W–50394. As noted *supra* at 783, Geosearch instituted a protest very similar to this one on January 25, 1979, almost eight months before Naartex initiated its protest. The Geosearch protest put Huff on notice that the lease might have been fraudulently obtained. Also, despite the close identity of the two corporations, the pendency of the Geosearch action does not toll the 30-day limit for Naartex, because BLM dismissed the protest due to Geosearch's failure to prosecute. *See supra* at 784. Even if the Geosearch action tolled the limitation period as to Naartex, IBLA dismissed the Geosearch protest on May 6, 1979, over four months before Naartex initiated its protest.

remedies, courts should not expand the coverage of the statute to subsume other remedies"); *Pullman v. Chorney,* 712 F.2d 447, 449–50 (10th Cir.1983) (finding no private right of action under the Mineral Lands Leasing Act because "the Act itself implies that there should be no further private remedy since 30 U.S.C. § 184(h)(1) (1976) authorizes the Attorney General to bring an action for the forfeiture of any lease acquired in violation of the Act.").

▆▆▆ Naartex in its brief also objects to the district court's failure to determine "whether its amended complaint stated . . . a cause of action for fraud, misappropriation or unjust enrichment" under the common law. We believe, however, that the district court did not abuse its discretion when it failed to address, and thereby *sub silentio* failed to transfer, the common law fraud claim.

In the first place, Naartex itself failed to make clear in the district court that it sought to pursue a claim for common law fraud separate and apart from its private right of action under the Mineral Lands Leasing Act. For example, the district court concluded that Naartex had "concede[d] that its action against the private defendants assumes the existence of an implied private right of action in the Mineral Leasing Act of 1920." 542 F.Supp. at 1202. To reach this conclusion, the district court relied upon Naartex's somewhat enigmatic statement that the defendants "will not be required under the Act to disgorge these illegal proceeds unless the court recognizes a private right of action under the Act and enters a judgment based on common law fraud." Reply in Support of Joint Motion for Russell Huff to Intervene or Be Joined as a Party Plaintiff at 2 (quoted in *Naartex,* 542 F.Supp. at 1202). Naartex made numerous other statements in the district court that appear to place complete reliance upon a private statutory right of action in support of its claims against the private defendants. *See, e.g., id.* at 2–3 (Naartex and Huff "are now seeking two basic forms of relief. First is the implication of a private right of action under the Mineral Leas-

ing Act of 1920 . . . . Second, . . . . plaintiff and Huff are also seeking judicial review of the decisions of the Secretary of the Interior denying plaintiff a hearing and cancellation of the lease."); Opposition of Naartex to Defendants' Motions to Dismiss the Amended Complaint at 15 ("plaintiff's cause of action is not of the type traditionally relegated to state law . . . . state law could not provide a remedy for plaintiff's harms."); *id.* at 21 (Naartex's and Huff's property right "adheres [sic] in the administrative process itself, *i.e.,* the right to a fair, untainted, oil and gas leasing program *as prescribed in the Mineral Leasing Act and the regulations promulgated pursuant to the Act.*") (emphasis added).

Moreover, Naartex's amended complaint does not make out any clear allegations of common law fraud. *Cf.* Fed.R.Civ.P. 9(b) ("the circumstances constituting fraud or mistake shall be stated with particularity"). Instead, in its complaint Naartex repeatedly alleged *regulatory* violations in support of its claims against the private defendants. *See* Amended Complaint ¶ 77 (RSC's and Albrecht's lease applications "were invalid under the applicable regulations"); *id.* ¶ 87 (American Natural Resources' and Michigan Wisconsin's interests in lease obtained "in violation of Department regulations"); *id.* ¶ 116 (RSC "violat[ed] Department prohibitions against multiple filings"); *id.* ¶ 123 (RSC, Harrell, Michigan Wisconsin, American Natural Resources, and General American Oil Co. "conspired to violate Department regulations governing the issuance and transfer of federal mineral leases"). At best, Naartex's complaint intertwined its purported common law claims and its asserted private statutory right of action to such a degree as to shroud its common law fraud claim from the view of a reasonably diligent eye. We therefore find that the district court did not abuse its discretion in failing expressly to address the common law claims.

▆▆▆ Furthermore, even if the district court had discerned the separate claim for common law fraud, it would properly have dismissed the claim. Because the court's federal question jurisdiction was

predicated upon a non-existent private right of action under the Mineral Lands Leasing Act, the district court should dismiss any state claims pendent to the defective federal claim. As the Supreme Court set it down, in the absence of diversity jurisdiction, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

 Of course, there might have been an independent jurisdictional basis for hearing the state claims if diversity jurisdiction had been adequately established in the Naartex amended complaint. In its amended complaint, however, Naartex neither alleged that 28 U.S.C. § 1332 extended jurisdiction to the district court over this case, nor did it plead the requisite facts to establish complete diversity.[20] Because federal courts are of limited jurisdiction, there is a presumption against the existence of diversity jurisdiction. *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure §§ 3522, 3611 (1975). Accordingly, the party seeking the exercise of diversity jurisdiction bears the burden of pleading the citizenship of each and every party to the action. *See, e.g., Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978); *Anderson v. Watt,* 138 U.S. 694, 702, 11 S.Ct. 449, 451, 34 L.Ed. 1078 (1891). After three attempts, however, and after notice that diversity jurisdiction should be shown, Naartex failed to meet this burden.[21] We therefore find the district court would have been justified in dismissing the common law claim on this alternative ground.

 Finally, we note that Naartex did not allege all the elements necessary to

---

20. Fed.R.Civ.P. 8(a)(1) requires that the complaint contains "a short and plain statement of the grounds upon which the court's jurisdiction depends...." The Naartex amended complaint stated only that "[t]his court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331(a) [federal question jurisdiction] and 1361 [mandamus jurisdiction]...." Amended Complaint ¶ 1, *reprinted in* N.A. at 2. No mention is made of *diversity jurisdiction or 28 U.S.C. § 1332.*

Furthermore, the facts alleged in the amended complaint do not establish diversity jurisdiction. To establish diversity jurisdiction, one must plead the citizenship of the corporate and individual parties. Naartex failed to do so. Under 28 U.S.C. § 1332(c), "a corporation shall be deemed a citizen of any state by which it has been incorporated and of the state where it has *its principal place of business."* Yet the Naartex amended complaint fails to allege the principal place of business for *any* of the corporate parties to this action. *See* Amended Complaint ¶¶ 3–15, *reprinted in* N.A. at 2–4. Furthermore, as to the individual defendants, Naartex alleged merely the states of residence. *See* Amended Complaint ¶¶ 8, 9, 13, 16, 17, *reprinted in* N.A. 3–4. Yet it has been held repeatedly that an allegation of residence alone *is insufficient to establish the citizenship necessary for diversity jurisdiction. See* 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3611, at 706 (1975), and cases cited therein.

21. Naartex sought leave to file a second amended complaint on March 15, 1982. Four months earlier, defendant RSC had brought to the district court's attention the first amended complaint's deficiency in pleading diversity jurisdiction. *See* Statement of Points and Authorities in Support of [RSC's] Motion for Judgment on the Pleadings at 12–13 (Asserting that "Naartex's amended complaint fails to properly allege the facts upon which this Court could exercise diversity jurisdiction" and pointing out that "a plaintiff must allege *both* a corporate defendant's state of incorporation *and* the state wherein its principal place of business is located") (emphasis in original). In its pleadings, Naartex claimed that its second amended complaint would "meet RSC's objections to the jurisdictional allegations of the amended complaint." Opposition of Naartex to Defendants' Motions to Dismiss the Amended Complaint at 37. The second amended complaint, however, failed to remedy this defect entirely, *see* Second Amended Complaint ¶ 14 (no allegation of Panhandle Western Gas Company's principal place of business), and persisted in alleging the "residence" rather than "citizenship" of individuals, *see id.* ¶¶ 3, 8, 9, 13, 16, 17. While we are cognizant that "[d]efective allegations of jurisdiction may be amended," 28 U.S.C. § 1653, courts are not obliged to indulge litigants indefinitely, especially when their amendments constitute futile gestures. *See Foman v. Davis,* 371 U.S. 178 at 182, 83 S.Ct. 227 at 230, 9 L.Ed.2d 222; *Jackson v. Salon,* 614 F.2d 15, 17 (1st Cir.1980); *DeBry v. Transamerica Corp.,* 601 F.2d 480, 492 (10th Cir.1979); *Holman v. Carpenter Technology Corp.,* 484 F.Supp. 406, 409 (E.D.Pa.1980), and cases cited therein.

make out a common law fraud action. In order to state a claim for common law fraud, the plaintiff must allege that the fraud caused him damage: "neither fraud without damage nor damage without fraud is sufficient to support an action." 37 Am. Jur.2d, Fraud & Deceit § 12, at 34; *see Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 192, 84 S.Ct. 275, 283, 11 L.Ed.2d 237 (1962); *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Systems, Inc.,* 665 F.2d 1066, 1070–71 (D.C.Cir. 1981). Furthermore, damages are "restricted in all cases to such damages as were the natural and proximate consequences, or the direct consequences, of the fraud, and to such damages as can be clearly defined and ascertained." 37 Am.Jur.2d, Fraud & Deceit § 343, at 461; *see Day v. Avery,* 548 F.2d 1018, 1028 (D.C.Cir.1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

Naartex, however, has failed to allege "any causal connections between the [fraud] and the injury which [Naartex] charges." *Day v. Avery,* 548 F.2d at 1028. This court recently described the workings of the simultaneous oil and gas lottery:

All applications filed before the deadline are deemed to have been filed simultaneously, and the BLM office holds a drawing early in each month to award the leases. Three applications are drawn for each parcel. If the person filing the first-drawn application qualifies to hold the lease, the lease is awarded to that person; if not, it is awarded to the second-drawn applicant, and so forth.

*Lowey v. Watt,* 684 F.2d 957, 960 (D.C.Cir. 1982). Russell Huff, whose interest Naartex seeks to represent in this action, was not one of the three applicants selected in the 1975 lottery for lease W–50394. Accordingly, in the absence of the alleged fraud, the lease would have been assigned to the second or third drawn applicants, and not to Huff. Thus, the alleged fraud could possibly have caused Huff any damage only if the second and third drawn applicants were also unqualified to receive lease W–50394, in which case "the lands under consideration would again be put up for lease in the next drawing." *Geosearch, Inc. v. Andrus,* 508 F.Supp. 839, 843 (D.Wyo.1981). Because Naartex did not allege that the second and third drawn applicants were not qualified to receive lease W–50394, therefore, the complaint failed to make out the causation and damage elements necessary to support a claim for common law fraud.[22]

To sum up, we find that the district court acted within its sound discretion when it dismissed the claims asserted against the private defendants. We now turn to review the district court's dismissal of the claims against the government.

## III. THE CLAIMS AGAINST THE GOVERNMENT

In three counts of its complaint,[23] Naartex seeks declaratory and mandamus relief against the Secretary of the Interior. In so doing, Naartex purports to assert the rights of Russell Huff; Naartex itself did not participate in the 1975 lottery. The district court found such vicarious claims to be "a classic violation of the federal anti-assign-

---

**22.** Naartex could conceivably have alleged that the presence of unqualified applicants in the lottery reduced Huff's chances of placing among the first three applicants selected. But even this characterization of causation and damage does not survive scrutiny. First, the regulations provide for review of the qualifications of applicants only after the selection takes place. *See* 43 C.F.R. § 3112.6–1 ("Rejection is an adjudicatory process which follows selection"). The lottery rules do not prohibit the expansion of the applicant pool by applicants who might, for example, have exceeded the allowable acreage limitation, *see id.* § 3101.1–5(a), or who are not citizens of the United States, *see id.* § 3102.2, or, as here, who

entered a service agreement later found to be an "interest" in the lease application. The rules of the lottery, therefore, do not establish a legally protected interest in a pristine applicant pool. Moreover, it is elementary that "speculative" damage will not support an action for common law fraud. *See, e.g., Day v. Avery,* 548 F.2d at 1028; 37 Am.Jur., Fraud & Deceit § 343, at 461. Naartex's notion that the alleged fraud by Albrecht and RSC deprived Huff of lease W–50394 is indeed quite speculative.

**23.** *See* Amended Complaint ¶¶ 44–73, *reprinted in* N.A. 9–14 (Counts I–III).

ment laws." 542 F.Supp. at 1203. We agree.

 Section 3727 (formerly 203) of title 31 provides that "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim" may be made "only after [the] claim is allowed, the amount of the claim decided, and a warrant for payment of the claim has been issued." Furthermore, any such assignment "must be attested to by 2 witnesses." 31 U.S.C. § 3727(b). Huff's agreement by letter to "sell, assign and transfer to [Naartex] all of [Huff's] rights in and to lease # W–50394" [24] clearly contravenes these provisions. Such inchoate interests in the government lease may not be assigned, and, in any event, the attempted assignment was not witnessed as required by the statute.

In addition, Section 15 of title 41 provides that "[n]o contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party . . . ." This section evidently prohibits the transfer of Huff's asserted "interest" in lease W–50394 to Naartex.[25]

Naartex argues that these provisions do not apply to the Huff assignment because "the policies of the anti-assignment provisions have not been violated" in this instance. Naartex Brief at 44. Yet for almost a century it has been repeatedly emphasized that a central purpose of both 31 U.S.C. § 3727 and 41 U.S.C. § 15 was "that the government might not be harassed by multiplying the number of persons with whom it had to deal." *Hobbs v. McLean,* 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940 (1886); *see United States v. Shannon,* 342 U.S. 288, 291–93, 72 S.Ct. 281, 283–284, 96 L.Ed. 321 (1952); *Scanwell Laboratories, Inc. v. Thomas,* 521 F.2d 941, 944 n. 3 (D.C. Cir.1975), *cert. denied,* 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976). The Huff as-

signment unquestionably violates this clearly articulated policy.

Naartex further contends that, in the event the anti-assignment laws invalidate the Huff assignment, the district court should have permitted Huff to be joined in order to pursue his own claims. While the district court acted properly in denying Naartex's motion to join Huff as a party plaintiff, we disagree with certain reasons offered by the court in support of the denial.

 The district court refused to permit Huff to intervene in part because "[t]he attempt to add Huff as a party plaintiff represents an obvious effort to revitalize a suit which Naartex would otherwise have no basis for litigating due to the operation of the anti-assignment laws." 542 F.Supp. at 1205. This ruling, however, overlooks the mandate of Fed.R.Civ.P. 17(a).

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Because the Anti-Assignment laws invalidate Huff's attempted transfer of his claims against the government to Naartex, he may represent the "real party in interest" in this action. In such cases, as a general rule, joinder within a reasonable time should be permitted, and the complaint may be amended, substituting the new plaintiff.

 In this case, however, the district court's denial of the joinder motion was justified by additional considerations. The Supreme Court has concluded that leave to amend pleadings, which is necessary to ef-

---

24. Letter from Russell Huff to Naartex at 2 (Sept. 10, 1979).

25. 41 U.S.C. § 15 also provides that "any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned." Because of the disposi-

tion of this case on other grounds, and because the parties did not address the issue in briefs or at argument, we need not decide whether this provision operates to extinguish Huff's claims against the government altogether.

fectuate the joinder of a party plaintiff, need not be granted when such action would be "futil[e]." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see Parker v. Baltimore & Ohio Railroad Co.,* 652 F.2d 1012, 1018–20 (D.C. Cir.1981) (reviewing proposed amendment to determine whether amendment would be futile); *In re Ampicillin Antitrust Litigation,* 82 F.R.D. 647 (D.D.C.1979). The district court correctly determined that the joinder of Huff to assert his claims against the government "would be utterly futile." 542 F.Supp. at 1206.

█ Lease W–50394 became a producing lease in 1977. *See supra* at 4. According to 43 C.F.R. § 3108.3(b) (1982), "[a] lease known to contain valuable deposits of oil or gas may be cancelled only by judicial proceedings in the manner provided in sections 27 and 31 of the Act." Similarly, under 30 U.S.C. § 188(b), leases are "subject to cancellation by the Secretary of Interior . . . unless or until the land covered by any such lease is known to contain valuable deposits of oil or gas." Therefore, as the district court observed, "[l]ease W–50394 cannot be cancelled administratively because it is a currently-producing oil and gas lease." 542 F.Supp. at 1205. A producing lease may be cancelled only through an "appropriate proceeding instituted by the Attorney General," 30 U.S.C. § 184(h)(1), or "an appropriate proceeding in the United States district court for the district in which the property, or some part thereof, is located," *id.* § 188(a). Mr. Huff is not the Attorney General and lease W–50394 does not cover land in the District of Columbia. We therefore find that the district court acted properly in denying the joinder of Huff to this action because such joinder would have been futile.

Finally, as we noted above, *see supra* at 788–789, the private defendants constitute indispensable parties to the action to cancel the lease. Because the private defendants could not properly be haled before the district court, *see supra* at 785–788, then, the entire action must be dismissed.

The district court thus correctly dismissed the claims against the government.

IV. CONCLUSION

For the reasons set forth above, the order of the district court dismissing this action is

*Affirmed.*